**BLUE GRASS PROVISION CO., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–1483.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 13, 1980.

Decided Dec. 9, 1980.

William K. Engeman, John E. Campion, Taft, Stettinius & Hollister, Cincinnati, Ohio, for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Howard Perlstein, Sandra Elligers, Penny Pilzer, Emil C. Farkas, Director, Region 9, N.L.R.B., Cincinnati, Ohio, for respondent.

Before LIVELY and KEITH, Circuit Judges, and LAMBROS, District Judge.*

LAMBROS, District Judge.

Blue Grass Provision Co., Inc. asks us to set aside a decision and order of the National Labor Relations Board that found Blue Grass had refused to bargain collectively in good faith with Truckdrivers, Chauffeurs and Helpers Local No. 100 regarding the company's decision to subcontract the delivery of its meat products. The Board's decision was accompanied by an order directing Blue Grass to reinstate its delivery operations and the delivery employees with back pay. The Board on cross–petition seeks enforcement of this order.

This case was commenced upon the filing of a complaint by the Board on August 10, 1977 alleging that "[s]ince on or about January 25, 1977, [Blue Grass Provision Co., Inc.] has failed and refused, and continues to refuse, to bargain collectively in good faith with the Union . . . by: (a) failing to negotiate with the Union with respect to its decision to permanently and immediately subcontract out all unit work performed by [the employees of Local 100] . . . and (c) [u]nilaterally subcontracting out all unit work performed by [those] employees . . . and discharging all employees of said unit" in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The case was heard by an Administrative Law Judge (ALJ) who found that the company had terminated the contract in violation of § 8(a)(1) and (5), and ordered the remedies previously mentioned.

---

* Honorable Thomas D. Lambros, District Judge, United States District Court, for the Northern District of Ohio, sitting by designation.

The Board affirmed. Petitioner now asserts that these findings are against the weight of the evidence and contrary to the interpretation of the National Labor Relations Act given by current decisions in this and in other Circuits.

At the time the dispute arose Blue Grass, a small family–owned company, had employed members of the union for about 20 years to make deliveries and was operating under a contract which was to expire on January 31, 1977. Concerned with rising costs, in early January company president William Rice began to explore the feasibility of subcontracting the delivery operations. At about the same time he contacted Local 100 Business Agent Fred Batsche to ask when they could meet to discuss a new contract. Batsche asked that they delay negotiations until the major packers had signed their contracts at which time union demands would be in clearer focus.

The two men finally met on either January 24 or 25, at which time the parties agreed to an eleven day extension of the contract. Batsche presented Rice with the proposals prepared by the union for presentation to all the area meat packers which contained, *inter alia*, a clause providing that no work presently performed by union members would be subcontracted. Batsche testified before the ALJ that Rice complained about the overall cost of the package but gave no indication that the subcontracting clause was particularly troublesome. Rice claimed, however, that he told Batsche that Blue Grass "wanted to get out of the trucking business." This meeting was admittedly inconclusive, with Rice wanting time to consider the proposals. The two met again on January 28, and Rice mentioned that he desired to negotiate a contract that would protect his employees so that they could retire through attrition and that he would refuse to negotiate if such a clause was not included. According to Batsche, this was the first indication the union had that Blue Grass was considering a change in its delivery operations.

On February 7, Rice called Batsche on the advice of counsel in order to make sure that the union understood the company wanted to terminate their trucking operations. According to Batsche, however, the discussion centered again on gradually phasing out the unit with Batsche strongly opposed. The conversation ended with Rice affirming that he was unwilling to negotiate further. Following this interchange, Rice realized that he had spoken too hastily, and sent a letter to Batsche the following day indicating that Blue Grass was still willing to pursue negotiations. This letter was not seen by Batsche until February 12.

With no extension sought by either side and the contract set to expire on February 11, Rice made plans to have a common carrier make his meat deliveries starting on Monday, February 14, contingent on the failure to reach an agreement with the union. Having heard nothing further from the union, on February 11 Rice informed his five drivers that they were laid off and that their work would be performed henceforth by a subcontractor. The laid–off drivers started picketing on February 15.

At the administrative hearing, Blue Grass argued that an impasse had been reached and that the union had waived its bargaining rights by refusing to consider the company's desire to subcontract. The union asserted that Blue Grass had breached its obligation not to make unilateral changes in employment conditions without first giving notice and bargaining with the statutory bargaining representative of the employees as required by *N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Faced with a conflicting narrative, the ALJ gave more credence to the testimony offered by Mr. Batsche.

Our function in reviewing his ruling as adopted by the NLRB is to examine the record in order to ascertain that the Board's findings of fact are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Retail Store Employees Union, Local 876*, 570 F.2d 586 (6th Cir. 1978). Having done so, we affirm the Board and dismiss petitioner's claim.

■ Blue Grass does not dispute that an employer must bargain about subcontracting which involves the replacement of employees in the existing unit with those of an independent contractor to do the same work under similar conditions of employment, *see Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), but asserts that it had properly notified the union of its intentions and given it a "meaningful chance to offer counter–proposals and counter–arguments," *NLRB v. J. P. Stevens & Co., Inc., Gulistan Div.*, 538 F.2d 1152, 1162 (5th Cir. 1976). In Blue Grass' view, the proper disposition would have been for the ALJ to dismiss because of the Union's failure to negotiate, citing for authority *The Emporium*, 221 NLRB 1211 (1975), and *Laclede Gas Co.*, 171 NLRB 1392 (1968). Those cases disclose, however, that the employer had unequivocally informed the union of an intention to subcontract work on a definite date and that the union failed to take advantage of that opportunity to negotiate. Our examination of the record before us in the instant case shows no such expression on the part of the employer. Even giving Rice's testimony full credence, we cannot say that when he left the January 24 meeting, Batsche was on notice that Blue Grass contemplated laying off all of the drivers at the expiration of their contract. It may well be that at the time Rice did not in fact plan to take such action. Unfortunately, subsequent discussions between the parties reflect that each wrongly assumed the other knew what issue was being discussed. Ideally, both gentlemen would have used greater clarity, precision and candor in their communications, but this was not the case, and the ALJ had substantial evidence before him to support a finding that Blue Grass had breached its duty to bargain by instituting a unilateral change before an impasse had been reached on a subject of mandatory bargaining.

■ Blue Grass replies that an impasse had been reached and that its actions in effect amounted to a legal lockout. We are not persuaded on either count. While that state of affairs that constitutes an impasse is not subject to precise definition, at least it encompasses the notion that both sides are aware of precisely what is at issue and that they have made more than a perfunctory attempt to reach a resolution. *See, e. g. Taft Broadcasting Co.*, 163 NLRB 475 (1967), enf'd sub nom. *AFTRA v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968). In light of a record that leaves considerable doubt whether the Union ever understood Blue Grass meant to terminate the bargaining unit upon expiration of the contract and that discloses that any meetings between the parties were at best preliminary sparring matches, we cannot say that there existed a "state of facts in which the parties, despite the best of faith, [were] simply deadlocked." *NLRB v. Tex–Tan*, 318 F.2d 472, 482 (5th Cir. 1963). This is particularly true in light of Blue Grass' own letter of February 8 evidencing its willingness to talk further with the union.

Blue Grass' assertion that the action it took would be legal had it been denominated a lockout does not alter our judgment. The Company cites *Lane v. NLRB*, 418 F.2d 1208 (D.C. Cir. 1969), aff'ing sub nom. *Darling & Co.*, 171 NLRB 801 (1968), for the proposition that an employer faced with a hard negotiating position but no impasse and not an imminent strike can lockout in support of its bargaining demands. In that case Judge Skelly Wright was careful to note that

[f]irst, employer conduct which is "inherently destructive" of employee rights is an unfair labor practice whether or not such conduct [is] based upon important business considerations. Second, employer conduct which has only a "comparatively slight" impact on the rights of employees will also be held an unfair labor practice unless the employer comes forward with evidence of "legitimate and substantial" reasons to justify his conduct.

418 F.2d at 1211. Judge Wright, however, was faced with a situation in which there had been ten negotiating sessions with the union before the lockout, the disagreement was over an issue that had been the subject

of a long strike some years earlier, the company had already made numerous concessions, and the union delayed striking until the company's peak season when 70 per cent of its annual production was to be shipped in a two–month period.

Assuming *arguendo* that Blue Grass' action was not "inherently destructive" of employee rights, it still cannot demonstrate that its business interests were so legitimate and substantial as to justify the impact that the lockout had on its employees' rights. Contrary to its assertions, Blue Grass had not made repeated attempts to get the union to recognize its plight. It was not faced with a situation that would have a devastating impact on its business and it certainly could have taken steps to have a common carrier act as a replacement if the union drivers went on strike at the expiration of the contract.

Under the circumstances, we think the Board's finding that there was a violation of Section 8(a)(1) and (5) is amply supported by the record. We are mindful that Blue Grass is a small company with a history of relatively peaceful labor relations and that the effect of the reinstatement order may cause it hardship. Nonetheless, the Board has a broad discretion in the remedies it selects to protect employees who are the victims of an unfair labor practice, *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), and so long as it has responsibly exercised its judgment, courts will not interfere with that remedy, which is peculiarly a matter for administrative competence. *Office and Professional Emp. Intern, Union Local 425, AFL–CIO v. NLRB*, 419 F.2d 314 (D.C. Cir. 1969).

Blue Grass' petition is dismissed, the decision of the Board is affirmed, and its cross–petition for enforcement of its order is hereby granted.